**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF TEXAS**

**HOUSTON DIVISION**

WOODBOLT HOLDINGS, LLC, a Delaware Limited Liability Company, and WOODBOLT DISTRIBUTION, LLC d/b/a NUTRABOLT, a Delaware Limited Liability Company,

Plaintiffs,

v.

KYLE THOMAS, individually, TERRENCE MOORE, JR., individually, MADISON MATHEWS, individually, and DRINK RECESS, INC., a Delaware corporation,

Defendants.

Case No. 4:26-cv-01669

**PLAINTIFFS' REPLY TO DEFENDANT DRINK RECESS, INC. IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

Date: April 15, 2026
Time: 2:00 PM
Judge: Hon. Keith P. Ellison
Date Action Filed: February 27, 2026

**PLAINTIFFS' REPLY TO DEFENDANT DRINK RECESS, INC. IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

ARGUMENT ........................................................................................................ 2

I. The Court Should Not Consider Recess's Opposition Because The Motion Is Not Directed To Recess. ........................................................................................................ 2

II. Nutrabolt Has And Continues To Suffer Irreparable Harm. ........................................ 3

III. Nutrabolt Has Established a Likelihood of Success On the Merits. ........................................ 8

IV. The Balance of the Equities Should Not Tip in Recess's Favor Because Recess Is Not the Primary Subject of the Preliminary Injunction Nutrabolt Is Seeking. .................. 9

V. A Preliminary Injunction Serves the Public's Interest in Honoring Promises and Protecting Businesses from Greedy Competitors. ........................................ 10

CONCLUSION ........................................................................................................ 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A-76 Techs., Inc. v. Mass Mgmt., LLC*,
No. 4:21-CV-923, 2021 WL 6202654 (S.D. Tex. Sept. 7, 2021)....6

*BCOWW Holdings, LLC v. Collins*,
No. SA-17-CA-00379-FB, 2017 WL 3868184 (W.D. Tex. Sept. 5, 2017)....6, 7

*Cambridge Strategics, LLC v. Cook*,
No. 3:10–CV–2167–L, 2010 WL 5139843 (N.D. Tex. Dec. 17, 2010)....10

*Daily Instruments Corp. v. Heidt*,
998 F.Supp.2d 553 (S.D. Tex. 2014)....6

*Embarcadero Techs., Inc. v. Redgate Software, Inc.*,
No. 1:17-CV-444-RP, 2017 WL 5588190 (W.D. Tex. Nov. 20, 2017)....7

*KeyCorp v. Holland*,
No. 3:16-CV-1948-D, 2017 WL 345645 (N.D. Tex. Jan. 24, 2017)....6

*Massimo Motor Sports LLC v. Shandong Odes Indus. Co.*,
No. 3:21-CV-02180-X, 2021 WL 6135455 (N.D. Tex. Dec. 28, 2021)....7

*Picker Int'l., Inc. v. Blanton*,
756 F.Supp. 971 (N.D. Tex. July 25, 1990)....9

*S. Texas Neon Sign Co. v. Ixtapa, Inc.*,
No. CV L-08-116, 2009 WL 10695760 (S.D. Tex. Feb. 27, 2009)....7

**Other Authorities**

Pat Pape, *Sipping Smarter: Functional Beverages Are in the Spotlight*, NACS MAGAZINE (Aug. 2025)....3

Sean Harapko, *How intentional consumer choices are shaping the US beverage market*, EY (Mar. 6, 2026)....4

## INTRODUCTION

Recess, Inc.'s ("Recess") Opposition to Nutrabolt's Motion for a Preliminary Injunction ("Motion") does not—and cannot—refute a damning factual record of trade secret misappropriation, Thomas's violations of his obligations to maintain the confidentiality of Nutrabolt's confidential information, and other unlawful conduct. Instead, Recess claims that it is simply "too late" for Nutrabolt trying to stop three former executives and a competitor from utilizing the trade secrets *all four defendants have admitted they have accessed* to gain an unfair leg up in the competitive, nascent industry of functional beverages. To deny Nutrabolt's request for injunctive relief simply because Nutrabolt initially trusted the representations of Recess's counsel would be to reward the very sort of conduct the DTSA and TUTSA were designed to prevent.

The forensic record—which Recess does not meaningfully dispute, and in fact appears to support—shows that Thomas forwarded over a dozen emails containing Nutrabolt's trade secrets to his personal and Recess email accounts, had assembled those materials into a 51-slide strategic presentation, and had flown to New York on Nutrabolt's dime to present that material to Recess's leadership weeks before Recess's counsel unequivocally represented that "there has been no breach of any agreement between Mr. Thomas and Nutrabolt." ECF 55-1 at Ex. 4. Now Recess assures the Court that it has dealt with the fourteen trade secrets Nutrabolt attaches to its Motion as examples of the theft committed by the Former Executives by deleting solely those fourteen documents from a limited number of Recess repositories. The Court has already seen what Recess's assurances are worth. Another round of empty promises is not a substitute for an injunction.

Recess's opposition rests on three arguments: (1) Nutrabolt unduly delayed; (2) Recess and Nutrabolt do not compete; and (3) Recess's forensic ring-fencing has neutralized any risk of future harm. All three fail. On delay, Nutrabolt did not learn of Thomas's systematic theft until mid-January 2026, and moved for injunctive relief within weeks of filing suit. The delay cases Recess

relies upon are readily distinguishable—none involved a plaintiff that was actively misled by defendants' pre-suit representations while its own forensic investigation was still ongoing.[1]

On competition, Recess's founder and co-CEO himself described Nutrabolt and Recess as "analogous" brands and hired Thomas specifically for his ability to build Recess into a "platform" brand like Nutrabolt. Thomas directed Moore to use Nutrabolt's own Numerator subscription to pull competitive intelligence on Recess—while Thomas was already secretly working there. Executives who believe they are going to a non-competitor do not build 51-slide strategic presentations derived from their current employer's trade secrets.

On remedial measures, Recess's own forensic expert's declaration confirms that it identified instances of the target documents on the devices and accounts of Thomas, Moore, Mathews, and Recess co-CEO Benjamin Witte—yet the keyword searches checked only document titles and did not assess whether the contents of those documents had made their way into other Recess documents or been shared with other Recess employees. Nor is there any mention of "ringfencing" hard copies, derivative documents like summaries, or external devices. More fundamentally, no forensic tool removes information from a human mind. Thomas presented Nutrabolt's strategies to Recess leadership in person in October 2025 and Recess acknowledges the trade secrets at issue were received by Mr. Witte. Deleting the slides months later does not undo that harm already done and that continues to be done. The Court should grant the preliminary injunction.

## ARGUMENT

### I. The Court Should Not Consider Recess's Opposition Because The Motion Is Not Directed To Recess.

Nutrabolt's Motion seeks a preliminary injunction against the Former Executives—not Recess. Recess lacks standing to oppose because the motion seeks no relief against it and does

[1] Recess seems to suggest that Nutrabolt should have immediately known, upon Thomas's departure, that something was amiss. Recess would argue that Nutrabolt should have started a forensic investigation at the same time. Such a suggestion is neither the law, nor a feasible practice for companies with at-will employment, standard turnover, and thousands of employees.

not affect its rights. Despite this, Recess has filed its own 24-page brief opposing the Motion, in addition to the 25-page brief filed by the Former Executives. This creates duplicative briefing and makes an end-run around the Court's page limits.[2]

### II. Nutrabolt Has And Continues To Suffer Irreparable Harm.

Recess mostly parrots the same arguments the Former Executives advance to argue Nutrabolt has not shown irreparable harm. For all the same reasons stated in Nutrabolt's reply brief filed contemporaneously herewith responding to the Former Executives' opposition brief (pp. 3-7), Recess's arguments fail. In brief, Nutrabolt responds to Recess's remaining arguments as follows:

*First*, Nutrabolt and Recess are competitors because "Recess develops, manufactures, and sells . . . beverages" (Recess Opp. 3), and because both companies "operate in the overall 'functional beverage' space" (Recess Opp. 16). Witte himself has described Nutrabolt and Recess as "analogous" brands and hired Thomas specifically for Thomas's ability to build Recess into a "platform" brand like Nutrabolt. ECF 22-1, Greene Decl. Ex. 6.; *see also* Bulut Decl. Ex. 2. Further, Witte states that in his search for a co-CEO, he was looking for an "industry veteran with experience maximizing revenues for beverage products in emerging categories." ECF 56-1, Witte Decl. at ¶ 23. Thomas's experience was attractive to Witte because Thomas's experience with scaling Nutrabolt's C4 and Bloom lines was directly relevant to scaling Recess *in the same industry*.

The respective size of competitors is immaterial because in the functional beverage industry, all companies compete intensely for the same highly limited market share of this nascent industry; even a small newcomer can be a big disrupter to the industry. *See* Pat Pape, *Sipping Smarter: Functional Beverages Are in the Spotlight*, NACS MAGAZINE (Aug. 2025), https://www.nacsmagazine.com/Issues/August-2025/Sipping-Smarter-Functional-Beverages-

[2] The Court should anticipate that, as this case progresses, every motion directed at one of the Former Executives, including motions to compel discovery, will result in Recess claiming a vested interest in the result and filing its own duplicative opposition. This is improper and unworkable.

Are-in-the-Sp. ("There are a lot of brands coming on the heels of what has been created, and you're still going to see brands emerging, trying to get their 1% of the category."). Recess's attempts to slice and dice the competitive landscape ignores the reality that Nutrabolt and Recess are competitors. The public also views the functional beverage market as encompassing both Nutrabolt and Recess. *See* Sean Harapko, *How intentional consumer choices are shaping the US beverage market*, EY (Mar. 6, 2026), https://www.ey.com/en_us/industries/consumer-products/wellness-trends-shaping-the-future-of-beverages (observing that "Functional beverages continue to gain momentum as consumers seek products that support everyday performance and balance, spanning needs such as immunity, gut health, sustained energy, and broader nutrition and beauty goals."). Recess's lack of irreparable harm arguments on the grounds that Recess and Nutrabolt's beverages do not compete (Recess Opp. 12-15), therefore, fail.

*Second*, Recess's attempt to distinguish Nutrabolt's cited authorities because those cases involved employees "competing against former employers using pilfered information" (Recess Opp. 15) blissfully ignores the striking "smoking gun" facts of this case: Thomas presented Nutrabolt's pilfered trade secrets to Recess in the "Agenda for NYC" presentation while he was still employed at Nutrabolt. Neither Recess nor Thomas denies this. And this is just one instance that Nutrabolt is *aware of* where Thomas utilized stolen trade secrets. Nutrabolt's injury is not "unfounded and purely hypothetical" (Recess Opp. 15); indeed Nutrabolt has presented substantial evidence of harm.

*Third*, Recess's argument that Nutrabolt's irreparable harm has been mooted and/or is unnecessary due to Recess's "proactive" efforts, including its belated and inadequate ringfencing, is nonsensical. By its own telling, its forensic experts got involved in April 2026 (ECF 56-1, Bandemer Decl. at ¶ 14), which is more than a month after Nutrabolt detailed a set of misappropriated trade secrets in its Complaint. It is also more than five months after Thomas presented Nutrabolt branded slides to Recess in early October 2025. Recess also admits that it instituted a litigation hold, not when it received Nutrabolt's October 2025 cease and desist letter,

but only after Nutrabolt filed its Complaint.[3] Incredibly, Recess also claims that it did not know about Thomas's non-compete agreements with Nutrabolt until it received Nutrabolt's cease and desist.[4]

Recess's contention that it "proactively engaged a forensic vendor to ringfence and sequester" (Recess Opp. 1) the trade secrets the Former Executives misappropriated is belied by the facts. Recess's remediation efforts by ringfencing the "Target Documents" at the thirteenth hour is woefully insufficient to remedy the irreparable harm. According to Bandemer's declaration, HKA identified instances of the Target Documents only "on the [Recess] devices and accounts of Kyle Thomas, Terrence Moore, Madison Mathews, and Recess Co-CEO Benjamin Witte." ECF 56-1, Bandemer Decl. at ¶ 6. The forensic review did not go far enough, because it did nothing to address the likelihood that the contents of the documents were exposed to other Recess employees. The forensic analysts' keyword searches show that they only searched for the titles of the Target Documents and did not check whether the contents of the documents made it into other Recess documents or whether they have been exposed to other Recess employees. *See* ECF 56-1, Bandemer Decl., Jimenez Decl., and Tian Decl. These limited keyword searches would not have captured summaries, partial extractions, screenshots, or other derivative materials. Moreover, the forensic review is entirely silent when it comes to (1) hard copy documents, (2) external devices such as external hard drives or USB drives, or messaging platforms such as Slack or WhatsApp. Even with the quarantining of documents Nutrabolt's trade secrets have likely already been shared at Recess. The harm done is irreparable, because Nutrabolt's trade secrets have already been incorporated into Recess's business strategies and have already been digested by Mr. Witte.

---

[3] Recess Opp. 8 (admitting that Recess only issued a litigation hold and a directive not to use Nutrabolt's confidential information on March 9, 2026—more than a week after Nutrabolt filed its complaint and more than four months after Nutrabolt's cease and desist letter).

[4] Recess Opp. 7 (Nutrabolt's cease and desist letter "was the first time Recess learned of the terms of Thomas's agreements with Nutrabolt"). This argument cannot hold true regarding Moore and Mathews, as its then-agent Thomas, was certainly aware of their restrictive covenants and pushed for them to be hired nonetheless.

*Fourth*, Nutrabolt did not unduly delay in moving for an injunction. While Nutrabolt knew that Thomas was in violation of his non-compete dating back to October 2025, Nutrabolt did not learn of his misappropriation of trade secrets until mid-January 2026. *See Daily Instruments Corp. v. Heidt*, 998 F.Supp.2d 553, 570 (S.D. Tex. 2014) ("delay will not negate a finding of irreparable harm where the plaintiff has a good explanation."). Nutrabolt then filed its 51-page complaint in February, and moved for injunction and expedited discovery within three weeks of initiating suit. In short, Nutrabolt moved for a TRO within two months of when it first learned its trade secrets *may have been* stolen. This delay does not foreclose irreparable harm. *See, e.g.*, *KeyCorp v. Holland*, No. 3:16-CV-1948-D, 2017 WL 345645, at *6 (N.D. Tex. Jan. 24, 2017) (issuing injunction despite the plaintiff's <u>ten month</u> delay in moving for the same due to pre-suit investigation and efforts to resolve the dispute). In *Daily Instruments*, for example, the court issued an injunction despite a <u>four month</u> delay because, like Nutrabolt, the plaintiff had "shown an ongoing immediate threat of continued irreparable injury to Plaintiff if a preliminary injunction is not issued." *Daily Instruments Corp.*, 998 F.Supp.2d at 570. Similar to Nutrabolt, *Daily Instruments* did not examine the defendant's returned laptop until nearly four months after the defendant's resignation. *Id.* There, the defendants objected to the plaintiff's request for expedited discovery which would have uncovered more theft, and the Court found that the defendants had not suffered any prejudice as a result of the delay. *Id*. So, too, here. *See, e.g*., ECF 22-2, Brown Decl. at ¶ 12 (Thomas did not return his Nutrabolt-issued laptop to Nutrabolt until more than a month after his last day of employment).

The undue delay cases Recess relies on are distinguishable on their facts. In *A-76 Techs., Inc. v. Mass Mgmt., LLC*, No. 4:21-CV-923, 2021 WL 6202654, at *2 (S.D. Tex. Sept. 7, 2021), the plaintiff waited "at least six months after learning of [the defendant's] alleged infringement" and the evidence showed it *knew* of potential infringement a year prior to that. *Id*. In *BCOWW Holdings, LLC v. Collins*, No. SA-17-CA-00379-FB, 2017 WL 3868184, at *17 (W.D. Tex. Sept. 5, 2017), the plaintiff waited four months after the defendant emailed its founder of his intent to use the plaintiff's logo, which the Court found was an undue delay in light of the plaintiff's

"extraordinary request" to "shut down JADAC's entire business and prevent it from being able to sell any of its inventory." *Id.* In *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17-CV-444-RP, 2017 WL 5588190, at *5 (W.D. Tex. Nov. 20, 2017), "[t]he delay was so substantial that by the first day of the preliminary injunction hearing . . . one year had passed since [the defendant's] last day [of employment] at [his prior employer plaintiff]." *Id.* Indeed, "[e]leven months had passed since [the plaintiff] was notified that [the defendant] had gone to [a competitor]." *Id.*; *see also S. Texas Neon Sign Co. v. Ixtapa, Inc.*, No. CV L-08-116, 2009 WL 10695760, at *4 (S.D. Tex. Feb. 27, 2009) (unlike there, Nutrabolt did not wait "over three months from when" the complaint was filed to move for an injunction; it did so within three weeks of its complaint); *Massimo Motor Sports LLC v. Shandong Odes Indus. Co.*, No. 3:21-CV-02180-X, 2021 WL 6135455, at *2 (N.D. Tex. Dec. 28, 2021) (finding delay because the plaintiff discovered trade infringement in July 2021, but did not move for injunction until November 2021—which was two months after it filed a complaint).

Here, without knowledge of Defendants' systematic theft of Nutrabolt's trade secrets, Nutrabolt first tried to resolve this matter outside of court by demanding that the Former Executives comply with their restrictive covenants. ECF 22-1, Greene Decl. at ¶ 5. But Recess's counsel rejected those requests. In doing so, it made false representations that "there has been no breach of *any* agreement between Mr. Thomas and Nutrabolt," and[5] "Mr. Thomas re-affirms that he has and will abide by his ongoing obligations to Nutrabolt, including with respect to *protecting confidential information* and not soliciting Nutrabolt employees, and Recess will direct him to do so." ECF 56-1, Sherman Decl. Ex. B (emphasis added). Thereafter, Nutrabolt conducted a forensic investigation that revealed Defendants' scheme to steal Nutrabolt's information and

[5] Recess makes no effort to explain how such representations were truthful at the time they were made. Recess may argue that the materials taken and retained by Thomas do not constitute a trade secret, but there can be no dispute that these were confidential materials belonging to Nutrabolt. By siphoning off these files, including sending them to the email address that Recess created for him before he resigned, Recess's assurances to the Court that it will suddenly start to respect Nutrabolt's legal rights should be given little weight.

disclosure of the same to Recess. Thus, the emergency circumstances giving rise to Nutrabolt's need for a preliminary injunction did not arise until late January.

An injunction is critical here because the documents taken by Thomas and Moore concern Nutrabolt's plans for 2026, and Recess will be able to—and likely already has been able to—derive benefit from this knowledge before a trial on the merits. For example, Thomas forwarded the Draft 2026 Pricing Strategy for Bloom and C4 beverages in September 2025. *See* ECF 22-1, Greene Decl. Ex. 13. This document was reflective of Nutrabolt's pricing plans for the year 2026 across multiple product lines and Nutrabolt cannot wait for the pendency of the lawsuit to prevent Recess from using such information to inform its own product offerings. An injunction is warranted because, as the record has demonstrated, Nutrabolt cannot rely on Recess's hollow and inadequate representations that it is not using Nutrabolt's information. An injunction is necessary given the risk to Nutrabolt's business and goodwill that money cannot solve. *See Heil Trailer Int'l Co. v. Kula*, 542 Fed. App'x 329, 335 (5th Cir. 2013) ("An irreparable injury is one that cannot be undone by monetary damages or one for which monetary damages would be 'especially difficult to calculate.'").

## III. Nutrabolt Has Established A Likelihood Of Success On The Merits.

For the reasons explained in Nutrabolt's Motion and companion reply brief (pp. 7-9), Nutrabolt has established a likelihood of success on the merits of its claims.

Recess contends that Nutrabolt has not shown it will likely prevail on its trade secrets claims because "[Mr.] Cantelli's descriptions fail to assign economic value to any of the information at issue, let alone any actual or imminent harm Nutrabolt has suffered over the past six months from their limited *disclosure*." Recess Opp. 18 (emphasis added). Not so. First off, Nutrabolt has furnished the Court with a copy of the trade secrets that the Former Executives misappropriated and has explained, in detail, why each document constitutes Nutrabolt's trade secrets, including why each is economically valuable. *See* ECF 22-3, Cantelli Decl. at ¶¶ 12, 15, 16, 18-20. To the extent Recess claims that Nutrabolt was required to "assign" a dollar value to each trade secret, it provides no supporting authority for that proposition.

*Second*, Recess's admission that Nutrabolt's trade secret was 'disclosed' is fatal. *See Picker Int'l., Inc. v. Blanton*, 756 F.Supp. 971, 979 (N.D. Tex. July 25, 1990) (granting preliminary injunction in misappropriation of trade secrets case and defining misappropriation with disclosure playing a key factor as "[o]ne who *discloses* or uses another's trade secret, without a privilege to do so, is liable if . . . his *disclosure* or use constitutes a breach of confidence reposed in him by the other in *disclosing* the secret to him") (emphasis added).

Next, Recess's contention that Nutrabolt has not shown likelihood of success on its breach of contract claims because its non-competes are unenforceable as overbroad (Recess Opp. 19) is ironic. Recess itself had Thomas sign a non-compete with nearly identical broad scope. *See* ECF 22-1, Greene Decl. Ex. 4.

## IV. The Balance Of The Equities Should Not Tip In Recess's Favor Because Recess Is Not The Primary Subject Of The Preliminary Injunction Nutrabolt Is Seeking.

Any injury to Recess does not outweigh the harm Nutrabolt has and continues to suffer in the balance of the equities. Recess has been around since 2018 and is not struggling based on its recent $25 million round of funding in October 2025. *See* Greene Decl. Ex. 6. Recess's business will not be crippled if an injunction is granted: its founding CEO, Ben Witte, remains in that role as co-CEO with Thomas. If Thomas was enjoined from providing services to Recess, Recess would be in the same position it was some eight months ago.

Recess stands to lose three employees for a temporary period and access to Nutrabolt's trade secrets with a preliminary injunction while Nutrabolt stands to lose its hard-earned goodwill and its proprietary trade secret business strategies that have enabled its success. The temporary inconvenience to Recess does not outweigh the immeasurable losses Nutrabolt will suffer from its trade secrets being used to build a competitor's business and pre-empt its business strategies in a highly competitive industry. To the extent Recess is concerned about the financial harm to the Former Executives, it could choose to pay their wages while they are enjoined.

### V. A Preliminary Injunction Serves The Public's Interest In Honoring Promises And Protecting Businesses From Greedy Competitors.

While individual liberty is a legitimate public interest, there is a significant public interest in honoring the terms of a contract. *See Cambridge Strategics, LLC v. Cook*, No. 3:10–CV–2167–L, 2010 WL 5139843, at *7 (N.D. Tex. Dec. 17, 2010) (granting a preliminary injunction in breach of contract, misappropriation of confidential information and tortious interference suit where "enforcing the parties' contract will serve the public interest because the public expects the terms of a contract to be honored"). The Former Executives freely entered into numerous agreements containing non-competition, non-disclosure, and non-solicitation obligations and were happy to receive the economic benefits thereunder. *See* ECF 22-2, Brown Decl. ¶¶ 8, 10, 18, 20, 27, 29. The public interest is served by requiring the Former Executives to stick to the promises they made, which were not unreasonable. Further, the public interest in honoring contracts does not condone third parties such as Recess to be unjustly enriched by inducing individuals to violate promises made to their former employers and to profit off of such unfair business practices. Granting a preliminary injunction would be a ruling in favor of the public interests at stake.

## CONCLUSION

**WHEREFORE**, for all the foregoing reasons, Nutrabolt respectfully requests that this Court enter the proposed Preliminary Injunction.

OF COUNSEL:

KORAY J. BULUT (*Pro Hac Vice*)
*kbulut@goodwinlaw.com*
HAYES HYDE (*Pro Hac Vice*)
*hhyde@goodwinlaw.com*
**GOODWIN PROCTER LLP**
525 Market Street
San Francisco, California 94105
Tel: (415) 733-6000

Dated: April 14, 2026

LOCAL COUNSEL

By: */s/ Mary Goodrich Nix*
Mary Goodrich Nix
Attorney in charge
Texas Bar No. 24002694
Southern District of Texas Bar No. 595797
mnix@lynnllp.com
Sara Hollan Chelette
Texas Bar No. 24046091
schelette@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies on April 14, 2026, a true and correct copy of the foregoing document was served on all counsel of record via the Court's CM/ECF system.

*/s/ Sara Hollan Chelette*
Sara Hollan Chelette