**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **WOODBOLT HOLDINGS, LLC,** *et al.***,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:26-CV-01669** |
| | § | |
| **KYLE THOMAS,** *et al.***,** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM & ORDER**

Before the Court is Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 22) ("Preliminary Injunction Motion"). For the reasons that follow, the Court **DENIES** the Motion and **ENTERS** the stipulations proposed by the individual defendants.

## I.    BACKGROUND

### a.  Factual Background

While the parties disagree on much, the following facts are undisputed except where otherwise noted.

Plaintiffs in this case are Woodbolt Holdings, LLC and Woodbolt Distribution, LLC, doing business as Nutrabolt (collectively, "Nutrabolt" or "Plaintiff"). Nutrabolt is a leading manufacturer, developer, distributor, and marketer of dietary and sports nutrition supplements, protein powders, protein drinks, energy drinks, and so-called functional beverages, which "refers to the category of drinks that provide health benefits or performance enhancements beyond basic nutrition and hydration." ECF No. 1 ("Complaint") at ¶¶ 23, 33. Most relevant here is Nutrabolt's Bloom product line, which consists of Bloom Sparkling Energy, an energy drink that "promotes

1 / 31

mental focus without the crash, with ingredients like natural caffeine derived from green coffee bean and the amino acid l-theanine" and Bloom Pop, "a 'better-for-you' soda offering a healthier alternative to traditional soft drinks." *Id*. at ¶ 35.

Defendants are Kyle Thomas, T.J. Moore, and Madison Mathews ("the Former Employees"), and DrinkRecess, Inc. ("Recess"). Thomas, Moore, and Mathews are former employees of Nutrabolt who now work at Recess. Recess is a beverage company that develops, manufactures, and sells non-alcoholic relaxation beverages, including sparkling waters infused with CBD[1] and magnesium and mocktails. Witte Decl. at ¶¶ 9-10.

Thomas worked at Nutrabolt from May 2021 through October 17, 2025. ECF No. 22 at 6. He served as Nutrabolt's Global Chief Commercial Officer (CCO). *Id*. Thomas has worked in the beverage industry for over twenty-five years, including at Coca-Cola, where he helped scale multiple beverage lines including Topo Chico, Honest Tea, Zico and Huberts. Thomas Decl. at ¶¶ 3-4. Moore and Mathews worked at Nutrabolt from June 2019 through November 3, 2025 and May 2018 through November 5, 2025, respectively. Brown Decl. at ¶¶ 16; 25. Moore served as Vice President of Strategic Insights and Mathews served as Vice President of Commercial Operations. At the time of Thomas' departure, Moore and Mathews were supervised by Thomas. Cantelli Decl. at ¶ 10.

All three Former Employees signed two sets of agreements containing restrictive covenants: (1) the Non-Disclosure, Non-Competition, and Non-Solicitation Agreements ("NDAs") and (2) the Incentive Unit Grant Agreements ("Grant Agreements"). *See* Brown Decl., Exs. 1, 9, 15 (hereinafter "NDAs"); Exs. 3-7, 11-13, 17-18 (hereinafter "Grant Agreements").

---

[1] CBD, short for cannabidiol, is a non-psychoactive component of the cannabis and hemp plants with relaxation properties. Witte Decl. ¶ 7.

2 / 31

These agreements contained prohibitions on certain types of competitive employment and solicitation of Nutrabolt employees and customers for a period of twelve months as well as prohibitions on disclosure or retention of confidential Nutrabolt information.

On September 16, 2025, Thomas notified Nutrabolt CEO Doss Cunningham that he had accepted a position as co-CEO of Recess and provided his two-weeks' notice. Thomas Decl. at ¶ 14. According to Thomas, Nutrabolt initially congratulated him on this opportunity and raised no concerns about his work at Recess violating his noncompete agreement. *Id*. At Cunningham's request, Thomas agreed to remain at Nutrabolt through October 17, 2025 in order to assist with the transition. *Id*. at ¶ 16. Thomas notified the commercial leadership team, which included Moore and Mathews, of his departure for Recess in an email dated September 24, 2025. *See* Thomas Decl., Ex. A.

Soon thereafter, Moore and Mathews also accepted offers to join Recess. Mathews accepted an offer from Recess on October 11 and submitted her resignation to Nutrabolt on October 17. Mathews Decl. at ¶ 12-14. Moore accepted his offer on October 15 and resigned on October 21. Moore Decl. at ¶ 8-9. According to Mathews and Moore, they saw Thomas as a mentor and were dissatisfied with his replacement at Nutrabolt, leading them to approach Thomas about potential roles at Recess. Mathews Decl. at ¶ 11; Moore Decl. at ¶ 8. Nutrabolt's position is that Thomas solicited Mathews and Moore, in violation of his contractual obligations, including at a dinner that took place on October 15, 2025.

In January 2026, Nutrabolt conducted a forensic investigation of the Former Employees' Nutrabolt email accounts. Through this investigation, Nutrabolt discovered that Thomas had forwarded fourteen attachments to himself or his wife between September 18, 2025 and October 14, 2025, three of which he sent to his Recess email account. *See* Green Decl. Exs. 12-26. Nutrabolt

argues that these documents contain trade secrets and/or confidential information, including Nutrabolt's confidential financial information, sales strategies for major retailers, and 2026 beverage assortment and pricing plans. Nutrabolt also discovered that Moore emailed two allegedly confidential documents to his personal email address before leaving Nutrabolt and that a presentation sent to Thomas by Mathews while both were still employed at Nutrabolt was incorporated into a presentation that Thomas later gave to Recess executives. ECF No. 22 at 24.

### b. Procedural History

Nutrabolt filed this lawsuit on February 27, 2026. It brings claims for violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. (DTSA) and the Texas Uniform Trade Secret Act (TUTSA) (against all Defendants); breach of contract (against the Former Employees); breach of fiduciary duties (against Thomas and Moore); tortious interference with contractual obligations (against Recess); and knowing participating in breaches of fiduciary duty (against Recess). *See* ECF No. 1 (Complaint). Relevant to the Preliminary Injunction are Nutrabolt's claims against the Former Employees for violations of state and federal trade secret law and breach of contract.

On March 18, Nutrabolt filed the instant Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 22) and a Motion for Expedited Discovery and Hearing (ECF No. 23). Nutrabolt initially requested that all the Former Employees be enjoined from: (1) employment with Recess "in any capacity that would cause them to compete with Nutrabolt or assist Recess to compete with Nutrabolt," (2) using or disclosing any confidential Nutrabolt information, (3) soliciting Nutrabolt employees and customers, (4) using or disclosing any of Nutrabolt's trade secrets; and (5) "[d]estroying, transferring, concealing or otherwise altering any documents, records, or electronic data" related to Nutrabolt's confidential information or the Former Employees contact with Recess. *See* ECF No. 22-5 ("Proposed Order").

4 / 31

The case was reassigned to this Court on March 20. *See* ECF No. 27 (Notice of Reassignment). Because Nutrabolt had waited approximately two months from its discovery of the alleged trade secret violations and approximately five months from its knowledge of the alleged breaches of the noncompete and non-solicitation agreements before moving for a Temporary Restraining Order (TRO), the Court was unwilling to move forward *ex parte* or adopt the ambitious discovery and briefing schedule proposed by Nutrabolt. Based on all parties' availability, the Court scheduled a hearing on the Preliminary Injunction Motion for April 15. The Court held a hearing on the Motion for Expedited Discovery on March 31. At this hearing, the Court gave Nutrabolt the options of either narrowing its discovery requests or delaying the April 15 hearing and ordered the parties to confer regarding the scope and timeline of discovery. *See* Minute Entry of April 15, 2026. The parties agreed to proceed with the April 15 hearing without additional discovery. *See* ECF No. 50 (Stipulation). The Preliminary Injunction Motion became fully briefed on April 14, 2026.[2]

The Court heard argument on the Motion on April 15. At the hearing, the Court expressed skepticism that Nutrabolt had shown it was entitled to the extensive preliminary relief it sought, particularly as to the restrictions on the Former Employees' employment at Recess. Additionally, Defendants described the steps already taken by Recess and the Former Employees to remove Nutrabolt's confidential information from Defendants' devices through a process known as "ringfencing," which they argued made much of Nutrabolt's requested relief moot. For its part,

---

[2] The Former Employees and Recess responded separately to the Preliminary Injunction Motion. Nutrabolt has argued that because the Motion nominally involves the Former Employees only, the Court should not consider Recess' response to the Motion or arguments made by counsel for Recess. But given Recess is a defendant in this lawsuit and given the relief requested by Nutrabolt would have serious implications for Recess, the Court concludes that Recess has standing to oppose the Motion.

Nutrabolt argued that the ringfencing process undertaken by Recess was insufficient. At the close of the hearing, the Court and took the Motion under advisement and ordered the parties to confer and attempt to come to an agreement as to at least some of the requested relief. On May 1, the parties informed the Court that they were unable to agree and submitted their respective proposals to the Court.

Nutrabolt proposed similar relief to that which it originally requested, but with more tailored restrictions on the Former Employee's employment at Recess. Specifically, Nutrabolt requested that Moore and Mathews be enjoined from any work at Recess "[t]hat would reasonably be expected to result in the use or disclosure of Plaintiffs' Confidential Information (as that term is defined in the [NDAs]) . . . and/or Trade Secrets" and from work "[r]elating to any new Recess product offerings." ECF No. 74. It requested that Thomas be more broadly enjoined "from providing services (as an employee, contractor, advisor, or in any other capacity) to Recess, or any of its subsidiaries or affiliates or otherwise in violation of his NDA or Incentive Unit Agreement." *Id*. Nutrabolt also proposed additional remedial measures, including sworn affidavits from the Former Employees and a Recess corporate representative affirming that Defendants had "conducted a diligent search" for confidential Nutrabolt information including searches of "all personal and work electronic devices, external storage devices, email accounts, cloud storage accounts, messaging platforms, social media, and physical copies," and that this information is no longer within their custody or control. *Id*.

The Former Employees proposed that the Court enter an order recognizing four stipulations as binding on the individual defendants and otherwise deny the Preliminary Injunction Motion. The Former Employees agreed to stipulate as follows:

> 1. Non-Disclosure & Non-Use: The Individual Defendants agree and stipulate they will not use or disclose any confidential or proprietary documents, records, or

electronic data belonging to Nutrabolt, including the documents identified as allegedly containing confidential and trade secret information in the Declarations of Gwen Greene (Dkt. 22-1) and Jason Cantelli (Dkt. 22-3) as Exhibits 12-26 (collectively, "Nutrabolt Confidential Information"). Nutrabolt Confidential Information shall not include any documents, data, or information that (i) is, or has become, publicly known through no fault of the Individual Defendants; (ii) is lawfully acquired by, or known to, the Individual Defendants independent of Nutrabolt; or (iii) was previously produced, disclosed, and/or provided by Nutrabolt without an obligation of confidentiality and not by inadvertence or mistake;

2. Kyle Thomas Employment: Individual Defendant Kyle Thomas agrees and stipulates that, in providing services (as an employee, contractor, advisor, or in any other capacity) to Recess, he shall not access, disclose, or use any Nutrabolt Confidential Information;

3. Remedial Measures: Upon identification by Nutrabolt of additional specific documents or data containing Nutrabolt Confidential Information that Nutrabolt reasonably believes may remain in any Individual Defendant's possession, the Individual Defendants stipulate that they will confer with Nutrabolt in good faith to attempt to develop a protocol for further remediation efforts; and

4. Preservation of Evidence: No provision herein obviates any obligations to preserve evidence, as consistent with the Federal Rules of Civil Procedure and all applicable law.

ECF No. 75 at 3. Given these stipulations and the remedial measures already undertaken by Recess, Defendants argued that Nutrabolt could not demonstrate the likelihood of irreparable harm necessary for a preliminary injunction. They further argued that Nutrabolt's proposed employment restrictions were overbroad and would effectively result in a prohibition on the Former Employees' employment at Recess.

## II.    LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). A party seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4]

that an injunction is in the public interest." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). To issue such relief, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)). Only when the movant has "clearly carried the burden of persuasion" should a court grant preliminary injunctive relief. *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009).

## III. DISCUSSION

Nutrabolt's request for a preliminary injunction is based the Former Employees' alleged breaches of their noncompete agreements, breaches of their non-solicitation agreements, breaches of their confidentiality/nondisclosure agreements, and violations of state and federal trade secret law. While Nutrabolt initially argued that the Former Employees should be enjoined from employment with Recess on the basis of the noncompete agreements, Nutrabolt argued at the hearing and in its post-hearing briefing that restrictions on the Former Employees' employment at Recess were justified on the basis of its trade secret claims. The Court will therefore address both potential bases for relief.

Because the Court's analysis differs with respect to each of Nutrabolt's claims against Defendants, the Court will address the claims in turn.

### A. Breach of Noncompete Agreements

Nutrabolt has not shown that it is likely to succeed on the merits of its claims that the Former Employees breached their noncompete agreements by working at Recess. Assuming without deciding that the agreements are valid and enforceable, the Court finds that Nutrabolt has not demonstrated that working at Recess constitutes a breach of the agreements.

To establish a claim for breach of contract under Texas law, a plaintiff must demonstrate (a) the existence of a valid contract; (b) performance or tendered performance by the plaintiff; (c) defendant's breach; and (d) damages. *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007). Here, the NDAs prohibit work on behalf of "any business that competes with the Company's business." NDAs at ¶ 5(b). The "Company's business" is defined as "the business of developing, manufacturing, distributing and/or marketing dietary or sports nutrition supplements, protein powders, bars, and drinks, and other produced related to the fitness industry in North America and throughout the world." NDAs at ¶ 2(a). The Grant Agreements prohibit employment or other work for any companies in the "business of manufacturing, developing, distributing or marketing dietary and sports nutrition supplements, convention food and drink products, including but not limited to energy drinks." Grant Agreements at ¶ 6(b).

The Court agrees with Defendants that Recess is not a "business that competes with the Company's business" as that business is defined in the agreement. Recess has four product lines: "(a) the Original Recess beverage line with CBD derived from hemp; (b) the Recess Mood beverage line with magnesium; (c) the Recess Mood powder products; and (d) the Recess Zero Proof craft mocktail beverage line. Witte Decl. at ¶ 9. Recess' website markets its beverages with slogans such as "Relax & Unwind with Recess" and "Calm for Every Occasion." *Id*. at ¶ 10. Given Recess' focus on relaxation-oriented beverages, the Court finds that Recess is not in "the business of developing, manufacturing, distributing and/or marketing dietary or sports nutrition supplements, protein powders, bars, and drinks, and other produced related to the fitness industry."

Recess is also not in the business of "dietary and sports nutrition supplements [or] convention food and drink products, including but not limited to energy drinks." [3]

Plaintiff argues that Recess should be understood as a competitor of Nutrabolt—specifically the Bloom product line—because both companies' products operate in the "functional beverage" market and compete for similar health-conscious customers and shelf space with retailers. But true as this may be, this is not how Nutrabolt chose to define competition in the noncompete provisions of the NDAs and Grant Agreements. [4] Indeed, term "functional beverage" does not appear anywhere in the noncompete agreements that Nutrabolt drafted—despite Nutrabolt's heavy reliance on this concept in its briefing. The Court therefore finds that Nutrabolt

---

[3] Nutrabolt changes the language of "convention" to "convention[al]" in their briefing, presumably suggesting that "convention" is a typo. The term is not defined in the Grant Agreements. The Court therefore interprets the term using the only example provided in the contract, energy drinks, and assumes that "convention" food and drinks are products similar to energy drinks, such a protein drinks and powders and other sports drinks. This is consistent with the definition of Nutrabolt's business in the NDAs.

[4] At points, Nutrabolt appears to argue that the restriction on "convention food and drink products" encompasses all companies that manufacture, develop, distribute or market any food and drink product that competes for a similar customer base as Nutrabolt. *See, e.g.*, Complaint at ¶ 126 ("The restriction expressly encompasses any competitive "food and drink products," not just energy beverages."). But this argument contradicts the plain meaning of the noncompete provision. First, the provision does not prohibit work for any company that is "competitive" with Nutrabolt. Rather, it prohibits work for certain businesses, including those that make "convention food and drink products, including but not limited to energy drinks." Grant Agreements at ¶ 6(b). To the extent that Nutrabolt is arguing that this provision prohibits work for any company that makes any food and drink products whatsoever, it is clearly overbroad and unenforceable. *See Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 298 (Tex. App. 2004) ("A covenant not to compete that contains an industry-wide exclusion from subsequent employment is unenforceable."). Rather, as discussed in the previous footnote, the Court interprets "convention food and drink" in the context of the reference to energy drinks as an example and in terms of the definition of Nutrabolt's business in the NDAs and concludes it refers to products such as sports supplements, protein drinks and powders, and other food and drink products related to the fitness industry, not sparking waters and mocktails.

10 / 31

is unlikely to succeed on the merits of its breach of noncompete agreement claims and declines to order injunctive relief on this basis.[5]

## B. Breach of Non-Solicitation Agreements

Nutrabolt also argues that the Former Employees should be enjoined from all forms of solicitation that are prohibited in the non-solicitation agreements. The Court disagrees. It concludes that Nutrabolt has not met its burden to show that it is likely to prevail on the merits of these claims and has not demonstrated that it is likely to suffer irreparable harm related to the non-solicitation agreements in the absence of a preliminary injunction.

### i. Likelihood of Success on the Merits

Although Nutrabolt treats the three Former Employees as interchangeable for the purposes of its requested injunctive relief, the evidence does not support this approach. In fact, there is no evidence that either Moore or Mathews engaged in any solicitation of Nutrabolt employees, customers, or vendors. As far as the Court can discern, Nutrabolt has not even alleged that Moore or Mathews are in breach of their non-solicitation agreement. *See* ECF No. 1 (Complaint) at ¶¶ 149-50 (alleging that "Thomas materially breached Section 6(c) [of the incentive unit grant agreements] by soliciting Nutrabolt's employees, including his Executive Assistant, Moore, and Mathews" but making no mention of solicitation by Moore or Mathews). The Court therefore finds that Plaintiff is unlikely to succeed on the merits of its non-solicitation breach of contract claims against Moore and Mathews.

---

[5] In its post-hearing submissions, Nutrabolt requests that Moore and Matthews be enjoined from working on "any new Recess product offerings," with the justification that this language serves to hold Defendants to their word that their work at Recess does not violate their noncompete agreements. *See* ECF No. 74. But a preliminary injunction is an "extraordinary and drastic remedy," *Holland Am. Ins. Co.*, 777 F.2d at 997, and the Court will not presume without evidence that Recess plans to expand into a category that would place it within the purview of the noncompete agreement.

The Court also finds that, at this juncture, Nutrabolt has not "clearly carried [its] burden of persuasion" to show that it is likely to succeed on the merits of its non-solicitation claims against Thomas. *Anderson*, 556 F.3d at 360. Nutrabolt alleges that Thomas solicited at least three Nutrabolt employees to join Recess: Moore, Mathews, and Thomas' Executive Assistant. Defendants have denied these allegations except as to Thomas' Executive Assistant (who is not a defendant in this case), which they do not address. However, Nutrabolt has presented no evidence of Thomas' solicitation of his Executive Assistant beyond the allegations in its Complaint, which is insufficient to meet its burden of persuasion.[6]

Nutrabolt's contention that Thomas solicited Moore and Mathews is primarily based on timing. Thomas announced his resignation on September 24, 2025. Moore Decl. at ¶ 6; Mathews Decl. at ¶ 8. On October 15, 2025, Thomas, Moore, and Mathews had dinner together in Chicago at the National Association of Convenience Stores trade show, skipping the Nutrabolt team dinner. *See* Greene Decl., Ex. 29; Cantelli Decl. at ¶ 22. Both Moore and Mathews resigned less than a week later. Nutrabolt contends that this dinner "was a recruitment meeting orchestrated by Thomas to finalize the plan to bring Moore and Mathews to Recess." ECF No. 22 at 19. Nutrabolt also points to the fact that Thomas emailed himself two spreadsheets containing confidential compensation information for senior Nutrabolt employees, including Moore and Mathews on October 13, 2025, as evidence that Thomas used this salary information to "poach" Nutrabolt's employees. *See* Greene Decl. Exs. 25-26.

The Former Employees paint a very different picture of these events. According to Mathews, she felt undervalued by Nutrabolt in part because she did not receive a promotion or

---

[6] While it is possible that Nutrabolt may eventually succeed on its non-solicitation claims against Thomas on this basis, the Court will not order preliminary injunctive relief on the basis of an allegation for which the Nutrabolt has presented no evidence.

salary increase between May 2018 and January 2022, despite her perception that her responsibilities expanded during that time. Mathews Decl. at ¶ 5. Mathews began working with Thomas in May of 2021 and came to view him as a mentor. *Id*. at ¶ 6. Thomas successfully advocated for Mathews to receive promotions and salary increases, and she was reassigned to report directly to him in June of 2022. *Id*. After Thomas announced his departure, Jason Cantelli, who was transitioning into Thomas' role, informed Mathews that her team was going to be reassigned to another employee. *Id*. at ¶ 9. Mathews was discouraged by these developments and began to consider leaving Nutrabolt. *Id*. at ¶ 10. She spoke with Thomas about her concerns and asked him if there were any openings at Recess for which she could apply. *Id*. at ¶ 10. Thomas referred her to Recess' CEO, Ben Witte, who reached out to Mattews to set up a conversation. *Id*. at ¶ 12. On October 11, 2025, Witte offered Mathews a position at Recess which she accepted.

Moore's portrayal of events is similar. Moore states that he became dissatisfied with his role at Nutrabolt over the course of 2025 after eight of his colleagues departed in quick succession. Moore Decl. at ¶ 5. He began looking for other positions and interviewed at other companies besides Recess. *Id*. Moore's dissatisfaction grew when he learned that Cantelli was transitioning into Thomas' former role, because he did not have a good working relationship with Cantelli. *Id*. at ¶ 7. Like Mathews, he approached Thomas to inquire about potential openings at Recess, and Thomas similarly referred him to Recess' CEO, who interviewed Moore and offered him a position. *Id*. at ¶ 8. Moore accepted on October 15, 2025. *Id*. Both Moore and Mathews deny that the October 15 dinner was a solicitation event, as they had already accepted offers to join Recess when it occurred. Mathews Decl. at ¶ 13; Moore Decl. at ¶ 27. Thomas also denies approaching Moore or Mathews about employment at Recess. Thomas Decl. at ¶ 20-21. Thomas further denies using the spreadsheets containing salary information for solicitation, stating that he retained these

13 / 31

documents to provide [him]self a reference point for compensation for various roles in the industry." *Id*. at ¶ 32.

The Court understands why the timing of Moore's and Mathews' departures raised concern at Nutrabolt. But viewing the full records before it, the Court has no reason to disbelieve the Former Employees' sworn statements that Moore and Mathews approached Thomas to inquire about potential roles at Recess, rather than the other way around. Nutrabolt has not presented any evidence that rebuts these statements and did not address them in its reply.[7] *See* ECF No. 60. While Moore and Mathews do not dispute that they became interested in working for Recess in part because Thomas, a supervisor who they liked and admired, had accepted a position there, this is not unusual and does not constitute solicitation by Thomas. Moore and Mathews were at-will employees, and they were free to inquire with Thomas about openings at Recess. The fact that Thomas put them in contact with Recess' CEO after they inquired about open positions and perhaps even vouched for them to Recess also does not constitute a breach of his non-solicitation obligations. While the Court agrees with Nutrabolt that Thomas likely violated his contractual obligations when he retained confidential Nutrabolt salary information, there is no evidence that he used this information to solicit Moore or Mathews. At this time, therefore, the Court finds Nutrabolt's evidence insufficient to show that it is likely to succeed on the merits of its non-solicitation claims on the basis of solicitation of Moore and Mathews.

---

[7] Nutrabolt has objected to the statements in each Former Employee's declaration that use the word "solicit" (Thomas Decl. at ¶ 20; Moore Decl. at ¶¶ 25, 26; Mathews Decl. at ¶ 23) as improperly stating legal conclusions and improper lay opinion. *See* ECF No. 62. But the Court gives no weight to the cited testimony insofar as it states disputed legal conclusions. Rather, the Court relies on Defendants' factual allegations that Thomas did not affirmatively approach Moore or Matthews about working at Recess or otherwise attempt to persuade them to do so.

Nutrabolt also alleges that Thomas' emails with other Nutrabolt employees after announcing his departure constituted solicitation in violation of his contractual obligations. Nutrabolt points to statements such as "Beverage is a small bubble. . . let's stay connected along the way, you never know when the next opportunity is to make beverage history!!!" and "the phone call will come in the near future and you will get to decide if you want to make beverage history again!" and argues they are "not innocent well wishes" but rather "thinly veiled solicitations laying the groundwork for future recruitment." ECF No. 22 at 20 (citing Green Decl., Exs. 30-36). But Nutrabolt does not present these statements in their full context. A review of the record reveals that Thomas sent these emails as replies to employees who reached out to wish him well and express gratitude for his contributions in response to his resignation announcement. Thomas appears to have used the same or very similar language in response to everyone who reached out to congratulate him. Additionally, there is no evidence before the Court that Thomas actually offered any of these employees positions at Recess or incentivized them to leave Nutrabolt. Indeed, Thomas' original email announcing his resignation contains numerous statements like "[t]he future here at Nutrabolt is so bright for all of us, and our business has massive momentum" and "[y]ou will be in great hands." Green Decl., Ex. 30. These emails, without more, do not constitute evidence of solicitation sufficient to support a preliminary injunction.

Finally, the Court sees no basis in the evidence for Nutrabolt's request that the Former Employees be enjoined from "soliciting or inducing any of Plaintiffs' customers to cease doing business with Plaintiffs or to reduce the amount of business it conducts with any of Plaintiffs" or "soliciting or inducing any of Plaintiffs' vendors to cease doing business with Plaintiffs or to reduce the amount of business it conducts with any of Plaintiffs." ECF No. 74. Nutrabolt has neither alleged nor presented evidence that any Former Employee has or intends to solicit any of

15 / 31

Nutrabolt's customers or vendors. Even taking all of Nutrabolt's allegations as true, Nutrabolt would not be entitled to relief of this scope.

### ii.    Irreparable Harm

In addition to finding that Nutrabolt is not likely to succeed on the merits of its non-solicitation claims, the Court also concludes that Nutrabolt has not demonstrated that it "is likely to suffer irreparable harm in the absence of preliminary relief" on this basis. *Winter*, 555 U.S. at 20. Nutrabolt has not presented any evidence of additional solicitation or other employees who have departed Nutrabolt for Recess in the six months since Mathews' and Moore's departures. Additionally, Nutrabolt did not move for a TRO until approximately four months after it became aware of Mathews' and Moore's departures. This delay weighs against granting preliminary injunctive relief on the non-solicitation claims.[8] *See, e.g.*, *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17-CV-444-RP, 2017 WL 5588190, at *3 (W.D. Tex. Nov. 20, 2017) ("Plaintiffs' delay in seeking injunctive relief is fatal to their request for a preliminary injunction.); *A-76 Techs., Inc. v. Mass Mgmt., LLC*, 2021 WL 6202654, at *2 (S.D. Tex. 2021) (finding no irreparable harm in trademark infringement case based solely on a 6 month delay between cease and desist letter and motion for PI); *BCOWW Holdings, LLC v. Collins*, No. SA-17-CA-00379-FB, 2017 WL 3868184, at *17 (W.D. Tex. Sept. 5, 2017) (finding "that Plaintiffs did not act with the sense of urgency consistent with a finding of irreparable harm" where they "waited almost four months to file the instant lawsuit" after finding out about the underlying conduct). The Court therefore denies Nutrabolt's requested relief.

### C.  Trade Secret Violations and Breach of Confidentiality Agreements

---

[8] The same analysis applies to Nutrabolt's breach of noncompete agreement claims.

16 / 31

Finally, Nutrabolt alleges that the Former Employees misappropriated Nutrabolt trade secrets and violated their confidentiality agreements. At the Preliminary Injunction Hearing, Nutrabolt argued that even if the noncompete agreements were inapplicable to employment at Recess, restrictions on the Former Employee's employment were justified on the basis of the alleged trade secret violations and breaches of confidentiality agreements.

Because there are wide factual differences in the alleged conduct of the three Former Employees, the Court addresses these claims separately as to each defendant.

### i.    Mathews

The sole basis for Nutrabolt's trade secret and breach of confidentiality claims against Mathews is that Mathews sent a copy of a presentation to Thomas on October 2, 2025—while both were still employed by Nutrabolt—which Thomas later included in the "Agenda for NYC" slide deck that he shared with Recess. *See* Green Decl., Exs. 10; 20. But Nutrabolt's arguments that this action constituted anything more than an employee performing a task requested by her manager are mere speculation, and the Court is unwilling to order injunctive relief against Mathews without additional evidence. Nutrabolt has not alleged that Mathews sent any confidential information to a non-Nutrabolt email address nor that she retained any confidential information after leaving Nutrabolt. *See* Mathews Decl. at ¶ 18 ("Following my employment at Nutrabolt, I no longer have access to my Nutrabolt email."). The Court therefore concludes that Nutrabolt is unlikely to succeed on its trade secret or breach of confidentiality agreement claims against Mathews.

### ii.    Moore

Nutrabolt alleges that Moore breached his confidentiality agreements and violated trade secret law when he emailed two documents to his personal email address prior to leaving Nutrabolt but after accepting an offer from Recess: (1) "QT Progression Exception"—an overview Moore

17 / 31

had sent to Jason Cantelli discussing a request to deviate from Nutrabolt's OOE (Optimal Operating Environment) standards at QuikTrip and (2) "Circle K - Latest version of OOE POG"— Nutrabolt's "planogram" showing product placement and merchandising strategy for Circle K convenience stores.[9] Cantelli Decl. at ¶ 16, Green Decl. Ex. 28-29.

Given Moore's contractual obligation not to retain any confidential Nutrabolt information after ceasing employment there, it is likely that forwarding these emails constituted breach of contract. But the mere fact that Moore admittedly retained these documents is insufficient to support a preliminary injunction. Assuming without deciding that the documents contained confidential trade secrets, Nutrabolt has not shown that Moore has disclosed these documents to Recess or is likely to do so in the future, which is required to demonstrate both irreparable injury and likelihood of success on the merits of the trade secret claim.[10] *See Cardoni v. Prosperity Bank*, 805 F.3d 573, 590 (5th Cir. 2015) (affirming district court's denial of preliminary injunction in trade secret case based on the court's "individualized assessment of whether disclosure had occurred or was likely to occur"); *Gen. Univ. Sys., Inc. v. HAL, Inc.*, 379 F.3d 131, 149-50 (5th Cir.2004) (noting that in order to establish trade secret misappropriation under Texas law, the plaintiff must show that the defendant "used the trade secret without authorization").

---

[9] In its Complaint, Nutrabolt also alleges that Moore forwarded an email entitled "Jason's Treasure Chest." Complaint at ¶ 88. The parties dispute the contents of this document, whether the document belonged to Nutrabolt, and Moore's reasons for forwarding the document. However, Nutrabolt does not mention this document in its Preliminary Injunction Motion and does not produce it as an exhibit for the Court's consideration, so the Court does not consider it as part of its analysis.

[10] To the extent Nutrabolt argues that it need not independently prove irreparable harm because the NDAs contained a stipulation that Nutrabolt would suffer "immediate and irreparable damage . . . for which it would have no adequate remedy" in the event of a breach, the Court disagrees. *See W&T Offshore, Inc. v. Endurance Assurance Corp.*, 2025 WL 2492478, at *4 (S.D. Tex. June 25, 2025) (collecting cases and holding that such a stipulation it is not "sufficient without more to meet the requirements of injunctive relief").

Nutrabolt has presented no evidence that Moore disclosed the information in these emails to Recess or that he is using it in his current work. Moore sent the emails to his personal email, not a Recess email account. Moreover, Moore has provided a convincing explanation of why he forwarded these emails to himself that has nothing to do with use of confidential Nutrabolt information. Moore states that he did not get along with Jason Cantelli, who was transitioning into Thomas' role, and found his management style "dismissive and demeaning." Moore Decl. at ¶ 7. Moore alleges that after he tendered his resignation on October 21, Nutrabolt's CEO became hostile and accused Thomas of soliciting Moore. *Id*. at ¶ 10. Moore heard rumors that the CEO attempted to persuade Recess to rescind Moore's job offer.[11] *Id*. at ¶ 11. Moore explains that he forwarded himself the emails in question as examples of instances where Moore felt that Cantelli had been dismissive of Moore's contributions to "document why [he] did not want to continue working at Nutrabolt." *Id*. ¶ 13. Since both emails contain comments by Cantelli that could be interpreted as critical of Moore, the Court credits Moore's explanation and finds it more likely than not that Moore retained the emails for personal reasons and has not disclosed confidential Nutrabolt information to Recess.

While Nutrabolt "need not show actual use of trade secrets [in order to be entitled to a preliminary injunction,] . . . it must show that [Moore] is 'in a position to use' trade secrets." *CAE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 263 (5th Cir. 2022). Since the Court finds that Moore retained these documents for reasons unrelated to disclosure of confidential

---

[11] Nutrabolt objects to this portion of Moore's declaration as hearsay. *See* ECF No. 62 at 16. This objection is overruled. First, the Federal Rules of Evidence do not apply in a preliminary injunction proceeding. *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence."). Second, the proffered statement is offered for its effect on the Moore, not for the truth of what it asserts.

19 / 31

information, it concludes that Moore's future use of Nutrabolt's purported trade secrets is unlikely. Moreover, Recess has hired an outside company to conduct a "ringfencing" procedure intended to identify and remove the confidential information identified by Nutrabolt from Defendants' devices and accounts. *See* Bandemer Decl. (describing ringfencing process). This process included a search of the Former Employees' and Witte's Recess laptops, personal iPhones, iCloud accounts, and Recess Google Workspace accounts. Bandemer Decl. at ¶ 16. The digital forensics expert who led this process stated that to a reasonable degree of technical certainty, none of the identified documents "is accessible to anyone using those devices or accounts or Recess's Google Workspace." *Id*. at ¶ 7. Recess has also offered to supplement these remediation efforts at Nutrabolt's request.[12] Finally, Moore has offered to stipulate that he "will not use or disclose any confidential or proprietary documents, records, or electronic data belonging to Nutrabolt," including the documents at issue here. ECF No. 75 at 3.

Under these circumstances, Nutrabolt cannot show that it is likely to succeed on the merits of its trade secret claims against Moore, nor that it will suffer irreparable harm based on Moore's actions.[13] *See Cardoni*, 805 F.3d at 589-90 (affirming denial of preliminary injunction on trade

---

[12] Nutrabolt argues that the measures taken by Recess are insufficient because (1) Defendants' personal laptops were not searched, (2) the declaration does not establish whether Defendnats' personal email accounts were searched and (3) the search process would not identify documents that were excerpted or altered (though it would capture files that had been renamed). *See* ECF No. 77. The Court understands the search of Defendants' iCloud accounts as addressing Nutrabolt's concern regarding Defendants' personal computers and accounts. To the extent Nutrabolt believes additional remediation is necessary, Nutrabolt can accept Recess' offer to suggest additional remediation steps. If Recess is unwilling to conduct additional searches, Nutrabolt may raise this issue with the Court at that time. At this point, however, the Court is persuaded that Recess' remediation efforts in combination with Moore's stipulation render future disclosure of confidential information unlikely.

[13] Nutrabolt additionally alleges that Moore sent an email to Thomas on October 6 containing "detailed consumer metrics for Recess in the mocktail and sparkling water markets" from Numerator, a consumer data company. Cantelli Declaration at ¶ 15. Nutrabolt alleges that Moore subsequently deleted the email from his "sent" messages and from his trash folder, suggesting a

20 / 31

secret misappropriation and breach of nondisclosure agreement claims where plaintiff "only made a speculative showing that [the former employees] have disclosed or used [plaintiff's] confidential information").

### iii.   Thomas

Nutrabolt's allegations against Thomas are more serious. Most troubling, Nutrabolt alleges that Thomas prepared a slide presentation for Recess which contained confidential Nutrabolt information and trade secrets, including brand strategy plans for C4 and Bloom, account-specific strategies for eight Nutrabolt retailers such as Target and Walmart, and other similar information. *See* Greene Declaration, Ex. 20. Some of the slides are Recess-branded, whereas the slides containing Nutrabolt's information have Nutrabolt branding. Thomas emailed this presentation from his Nutrabolt email to his Recess email on October 5, 2025, using the file name "Agenda for NYC." *Id*. The presentation is dated October 6-8, 2025. *Id*. Nutrabolt contends that these dates correspond to a trip Thomas took to New York while employed by Nutrabolt, which it now believes Thomas used as an opportunity to meet with Recess' CEO.[14]

In addition to the slide deck, Thomas also sent two other Nutrabolt documents to his Recess email address (Green Decl., Exs. 21-22) and eleven documents to his or his wife's personal email addresses. (Green Decl., Exs. 12-19, 22-26). Nutrabolt alleges that all of these documents contain confidential information and trade secrets.

### i.   Likelihood of Success on the Merits

---

consciousness of guilt. *Id*. But even if this is the case, Recess' consumer metrics are not Nutrabolt's trade secrets. While Nutrabolt may be able to show that Moore violated a duty to Nutrabolt by using its resources for a non-work-related purpose, this injury can be compensated by monetary damages. Injunctive relief against Moore on this basis is therefore inappropriate.

[14] Nutrabolt also alleges that Thomas fraudulently billed this trip to Nutrabolt as a business expense. Brown Declaration, Ex. 8. To the extent Nutrabolt argues it is entitled to relief on this basis, this claim is compensable by money damages.

"To state a claim for trade secret misappropriation under Texas law, a plaintiff must (1) establish that a trade secret existed; (2) demonstrate that the trade secret was acquired by the defendant through a breach of a confidential relationship or discovered by improper means; and (3) show that the defendant used the trade secret without authorization from the plaintiff." *Gen. Univ. Sys., Inc. v. HAL, Inc.*, 379 F.3d 131, 149-50 (5th Cir.2004). The elements of a federal trade secret misappropriation claim are similar. *See Winsupply E. Houston v. Blackmon*, No. 21-cv-01387, 2021 WL 5504756, at *5 (S.D. Tex. Nov. 22, 2021) ("[A] plaintiff must show that it owns a trade secret; its trade secret was misappropriated; and the misappropriated trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce [to establish misappropriation under federal law].") The Texas Supreme Court has stated that "a trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). At the preliminary injunction stage, "the trial court determines whether the applicant for preliminary injunction has established that the information is entitled to trade secret protection until a trial on the merits." *Anadarko Petroleum Corp. v. Davis*, No. CIV.A. H-06-2849, 2006 WL 3837518, at *15 (S.D. Tex. Dec. 28, 2006) (quoting *Fox v. Tropical Warehouses, Inc.,* 121 S.W.3d 853, 858 (Tex.App.-Forth Worth 2004, no pet.).

Additionally, to establish a claim for breach of contract under Texas law, a plaintiff must demonstrate (a) the existence of a valid contract; (b) performance or tendered performance by the plaintiff; (c) defendant's breach; and (d) damages. *Smith Int'l, Inc.*, 490 F.3d at 387. In this case, Thomas agreed "not to disclose any such Confidential Information, directly or indirectly, to any person or entity or use such Confidential Information for his or her own personal benefit or for the benefit of any third party." NDAs at ¶ 4(a)-(b). The NDAs defined "Confidential Information" as

22 / 31

"(i) technical information such as trade secrets, know-how, . . . products, product plans, product formulations and specifications, research, analyses, designs, design drawings, design, analysis, predictions[;]" and "(ii) business information, such as customer and prospective customer lists and preferences, vendor lists, the identity of distributors, manufacturers and suppliers, client goodwill, pricing information and strategies, costs, profit margins, marketing strategies and materials, sales plans, sales proposals and techniques, marketing or business plans, fee schedules, financial information, processes, testing, data and compilations of information, analyses, procedures and results[.]" NDAs at ¶ 2(b).

Defendants dispute that the information contained in Thomas' emails constitutes protected trade secrets under state or federal law. But even if this is the case, the Court concludes that at least some of the documents, including portions of the "Agenda for NYC" presentation, clearly contain confidential information as that term is defined in the NDAs. It appears to be undisputed that Thomas shared the "Agenda for NYC" presentation with Recess. In his declaration, Thomas does not deny that he prepared this presentation for Recess or that he presented it to Recess executives during his trip to New York in October of 2025. Nutrabolt is therefore likely to succeed on the merits of its claim that Thomas breached his confidentiality agreement.[15] Assuming without deciding that the presentation contained confidential trade secrets, the Court also concludes that Nutrabolt's evidence is sufficient to show that Thomas acquired the purported trade secrets through a breach of a confidential relationship given his contractual nondisclosure obligations and that

---

[15] Thomas states in his declaration that he "never got the impression [Nutrabolt] was a company that considered its marketing or corporate growth strategies to be proprietary or secret" and notes that "company leaders frequently discussed corporate strategy publicly on social media, in press releases, and other public platforms." Thomas Decl. at ¶ 31. If true, this may have relevance to whether Nutrabolt's documents are entitled to trade secret protections, but it is irrelevant to Thomas' obligations under the confidentiality agreement.

Thomas used at least some of the trade secrets without Nutrabolt's authorization. Thomas has not denied that he shared the "Agenda for NYC" presentation with Recess, which would constitute unauthorized use of any trade secrets contained therein. While Nutrabolt has not shown direct use or disclosure of any of the other documents that Thomas sent to his Recess or personal email addresses, it is reasonably likely that Thomas intended to use these documents in some way while employed at Recess, particularly those documents sent directly to his Recess email.

In short, Nutrabolt has shown it is likely to succeed on the merits of its breach of contract claims based on the series of Nutrabolt documents that he emailed to himself in September and October of 2025. The Court will also assume for the purposes of the Preliminary Injunction Motion that Nutrabolt is likely to succeed on at least some of its trade secret misappropriation claims against Thomas.

### ii. Irreparable Harm

The Court next turns to the question of whether Nutrabolt will be irreparably harmed in the absence of a preliminary injunction against Thomas. While the Court agrees with Nutrabolt that it could be irreparably harmed if Thomas were to retain access to confidential Nutrabolt trade secrets while employed at Recess, it concludes that the proper remedy is to enjoin use and disclosure of Nutrabolt's trade secrets, not to further restrict Thomas' employment. In light of the stipulations offered by the Former Employees and the remediation already undertaken by Recess, the Court is not persuaded that injunctive relief is necessary to prevent irreparably injury to Nutrabolt.

Nutrabolt argues that Thomas' "continued possession and use of Nutrabolt's misappropriated trade secrets to compete in the same functional beverage market poses an imminent and ongoing threat of irreparable harm to Nutrabolt's competitive position, advantageous business relationships with its customers, and the confidentiality and secrecy of its

proprietary business information." ECF No. 22 at 9. The Court agrees that were Thomas to retain access to documents containing Nutrabolt's confidential information and trade secrets, the threat of irreparable harm to Nutrabolt could be significant. *See Sunbelt Rentals, Inc. v. Holley*, No. 3:21-cv-3241-n, 2022 WL 1049468, at *6 (N.D. Tex. Apr. 7, 2022) ("[T]he disclosure of trade secret information constitutes irreparable injury as a matter of law."); *Daily Instruments Corp. v. Heidt*, 998 F.Supp.2d 553, 570 (S.D. Tex. 2014) (holding that a former employee's "disclosure of confidential information satisfies the irreparable injury prong for purposes of a preliminary injunction").

But "when a former employee misappropriates his employer's trade secrets, the appropriate remedy is to enjoin use and disclosure of those secrets, not to enjoin work in competition with the former employer."[16] *Anadarko Petrol. Corp.*, 2006 WL 3837518, at *24. In *Anadarko*, the defendant—a former employee of Anadarko—downloaded the equivalent of approximately 1.5 million pages of Anadarko data onto a USB drive before leaving to work at a competing oil company. *Id.* at *6. These files included a confidential report containing Anadarko's internal assessment of the value of its oil wells. *Id*. at *7. The defendant also admitted that he used one piece of information from Anadarko's report to draft a report for his new employer, who was seeking to purchase some of Anadarko's oil wells. *Id*. at *9. For its part, Anadarko asserted that the defendant extensively relied on confidential information in producing the report for his new employer and could not have prepared the report as quickly as he did without it. *Id*. at *16-17. It

---

[16] While Nutrabolt cites cases involving trade secret misappropriation in which courts have enjoined or seriously restricted a defendant employee's employment with a new employer, these cases also involved findings that the defendant employee had violated a noncompete agreement. See, e.g., *Keurig Dr Pepper Inc. v. Chenier*, No. 4:19-CV-505, 2019 WL 3958154, at *11 (E.D. Tex. Aug. 22, 2019); *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 568 (S.D. Tex. 2014); *Sunbelt Rentals, Inc. v. Holley*, No. 3:21-CV-3241-N, 2022 WL 1049468, at *3 (N.D. Tex. Apr. 7, 2022). The Court has concluded such is not the case here.

requested a preliminary injunction prohibiting the defendant from working for any competitor of Anadarko—including his new employer. *Id*. The court found that Anadarko was likely to succeed on the merits of its trade secret and breach of confidentiality agreement claims and that it was entitled to some form of injunctive relief, but concluded that any relief beyond enjoining the defendant's use or disclosure of trade secrets was overbroad. *Id*. at *23-24.

This reasoning is consistent with the plain language of the DTSA. While the DTSA permits a court to enter an injunction "to prevent any actual or threatened [trade secret] misappropriation," such an injunction must not "prevent a person from entering into an employment relationship" and "conditions placed on.  .  . employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows." 18 U.S.C. § 1836(b)(3)(A)(i). The TUTSA contains similar language. Tex. Civ. Prac. & Rem. Code Ann. § 134A.003 (West 2025) ("Actual or threatened [trade secret] misappropriation may be enjoined.").

While Nutrabolt no longer seeks to enjoin Thomas from working for Recess entirely, the relief it requests would effectively prohibit him from fulfilling in the core functions of his role as co-CEO of Recess. This goes beyond what is necessary to prevent irreparable harm to Nutrabolt on the basis of its trade secret and confidential information claims, particularly since Nutrabolt has not shown it is likely to succeed on the merits of its breach of noncompete agreement claims. It is true that Thomas, like the defendant in *Anadarko*, transmitted confidential Nutrabolt information outside the company and disclosed at least some of this information to Recess. But this merely restates the conclusion that Nutrabolt is likely to succeed on the merits of some of its claims against Thomas—it does not warrant more extensive limitations on Thomas' role at Recess. Indeed, the defendant's misconduct in *Anadarko* was more severe than even the strongest version of Nutrabolt's allegations against Thomas—and resulted in more tangible harm to Anadarko in that

it assisted a competitor in obtaining funding for an offer to purchase Anadarko's oil wells. Even so, the court concluded that Anadarko "ha[d] not shown that it w[ould] suffer irreparable harm of a nature that supports a broader injunction" than the defendants' existing agreement to return all confidential Anadarko information. *Anadarko Petrol. Corp.*, 2006 WL 3837518, at \*24. This Court concludes that the same is true here. Any broader restrictions on Thomas' employment would cross the line from protecting Nutrabolt's confidential and trade secret information to infringing on Thomas' right to rely on the general knowledge gained during his decades of experience in the beverage industry.

Nutrabolt also points to various statements by Thomas and Recess CEO Benjamin Witte as evidence that Recess hired Thomas specifically to gain access to his confidential knowledge about Nutrabolt. For example, it points to an employment proposal Thomas sent to Recess in which he stated that he could give Recess "access to better data and insights that could be utilized for growth" and help create a "build to invest model" leveraging "industry expertise, innovative strategies, and data-driven insights." Greene Decl. at Ex. 2. It also points to an interview in which Witte stated that he reached out to Thomas about the co-CEO role because he "looked at like Honest [Tea] and Topo Chico. . . and C4 Energy and Bloom and . . . realized Kyle [Thomas] was. . . responsible for scaling. . . some of the best platform brands to ever exist." ECF No. 22, Ex. 2 at 5:24. The Court is unpersuaded. Rather, these statements suggest that Recess hired Thomas because of his extensive experience in the beverage industry and his success in launching popular new beverage lines—presumably the same reason why Nutrabolt hired him back in 2021. "[A]lthough [Thomas] may not use confidential information or trade secrets in his new employment, 'a former employee may use the general knowledge, skill, and experience acquired during the employment relationship.'" *Dresser-Rand Co. v. Schutte & Koerting Acquisition Co.*,

27 / 31

No. CIV.A. H-12-184, 2012 WL 460275, at *9 (S.D. Tex. Feb. 13, 2012) (quoting *Anderson Chem. Co. v. Green*, 66 S.W.3d 434, 442 (Tex. App. 2001).

Finally, to the extent that Nutrabolt argues that Thomas' disclosure of trade secrets is inevitable because he is employed in a similar role at a company also in the functional beverage industry, the Court disagrees. In *Cardoni v. Prosperity Bank*, the Fifth Circuit rejected the notion that Texas law has adopted the so-called "inevitable disclosure" doctrine—the idea that when a former employee possesses knowledge of their former employer's trade secrets or other confidential information and accepts a similar role with a competitor, the employee will inevitably rely on that information. 805 F.3d 573, 589–90 (5th Cir. 2015).[17] Thomas is entitled to rely on the twenty-five years of beverage industry experience he has acquired over the course of his career and can do so without disclosing Nutrabolt's confidential information.

For all of these reasons, the Court concludes that the proper remedy for Thomas' potential disclosure of additional Nutrabolt trade secrets is to enjoin him from using or disclosing any these trade secrets—not to otherwise restrict his employment at Recess. The Court further concludes that, in this case, the Former Employees' proffered stipulations and the remediation already undertaken by Recess render any additional injunctive relief unnecessary.

As previously discussed, the Former Employees have proposed that the Court enter an order recognizing four stipulations as binding on the Defendants—including an agreement by

---

[17] Nutrabolt cites *Daily Instruments Corp. v. Heidt* for the proposition that "[a]n employee who possesses trade secrets belonging to a former employer and accepts employment with one of its competitors, even if acting in good faith, will have difficulty preventing his knowledge from infiltrating his work." 998 F.Supp.2d at 569. But *Daily Instruments* was decided prior to the Fifth Circuit's opinion in *Cardoni* and is not binding on this Court. Additionally, the *Daily Instruments* court found that, in addition to misappropriation of trade secrets, the defendant had violated his noncompete agreement by working for his new employer. *Id*. at 568. Nutrabolt has not shown that is the case here.

Thomas that he will not "access, disclose, or use any Nutrabolt Confidential Information" while providing services to Recess in any capacity. ECF No. 75 at 2. They define "Nutrabolt Confidential Information" as "any confidential or proprietary documents, records, or electronic data belonging to Nutrabolt, including the documents identified as allegedly containing confidential and trade secret information in the Declarations of Gwen Greene and Jason Cantelli." *Id*. Additionally, all three Former Employees have agreed that they "will not use or disclose" any Nutrabolt Confidential Information. Thomas—as well as Moore and Mathews—have also submitted sworn declarations stating that to the best of their knowledge, they can no longer "access, use, or delete" the confidential files identified by Nutrabolt because of the ringfencing protocols employed by Recess' IT vendor. Thomas Decl. at ¶ 34; *see also* Moore Decl. at ¶ 16; Mathews Decl. at ¶ 18-19.

In light of the remediation efforts undertaken by Recess and the stipulations offered by the Former Employees, the Court concludes that Nutrabolt "has not shown that it will suffer irreparable harm of a nature that supports a broader injunction than is already in place." *Anadarko Petrol. Corp.*, 2006 WL 3837518, at *24; *see also Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17-CV-444-RP, 2017 WL 5588190, at *3 (W.D. Tex. Nov. 20, 2017) ("[T]o the extent that Plaintiffs could suffer irreparable harm from [defendant's] retention of the documents belonging to Plaintiffs on his Google Drive, his agreement to delete all such documents and turn them over to Plaintiffs negates the potential for any such harm."). Any harm that Nutrabolt suffered as a result of Thomas' past disclosure of confidential information is compensable by money damages after trial. *See Winsupply E. Houston v. Blackmon*, No. 4:21-CV-01387, 2021 WL 5504756, at *8 (S.D. Tex. Nov. 22, 2021) (noting that "irreparable harm 'must be based on *future harm* arising from *future activity* if not enjoined'") (quoting *Amid Inc v Medic Alert Foundation United States Inc*, 241 F Supp 3d 788, 824 (S.D. Tex. 2017)).

29 / 31

While Nutrabolt has raised concerns about the scope and effectiveness of Recess' ringfencing procedures, the Court is persuaded that they are sufficient in combination with the Former Employees' binding stipulations to refrain from use or disclosure of any confidential Nutrabolt information. Nutrabolt has also argued that the Former Employees generally and Thomas specifically cannot be trusted to abide by their agreed stipulations because of their past dishonesty toward Nutrabolt. But the Court disagrees that this supposition is supported by the evidence and, in any case, the same concern would apply to a preliminary injunction order crafted by the Court. Indeed, the proffered stipulations go beyond the injunctive relief to which the Court has concluded Nutrabolt is entitled to in that they enjoin all three Former Employees from use and disclosure of confidential information, rather than Thomas only.

## IV.    CONCLUSION

The Court therefore **DENIES** Nutrabolt's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 22). The Court further recognizes the following stipulations as binding on Defendants.

> 1. Non-Disclosure & Non-Use: The Individual Defendants agree and stipulate they will not use or disclose any confidential or proprietary documents, records, or electronic data belonging to Nutrabolt, including the documents identified as allegedly containing confidential and trade secret information in the Declarations of Gwen Greene (Dkt. 22-1) and Jason Cantelli (Dkt. 22-3) as Exhibits 12-26 (collectively, "Nutrabolt Confidential Information"). Nutrabolt Confidential Information shall not include any documents, data, or information that (i) is, or has become, publicly known through no fault of the Individual Defendants; (ii) is lawfully acquired by, or known to, the Individual Defendants independent of Nutrabolt; or (iii) was previously produced, disclosed, and/or provided by Nutrabolt without an obligation of confidentiality and not by inadvertence or mistake;
>
> 2. Kyle Thomas Employment: Individual Defendant Kyle Thomas agrees and stipulates that, in providing services (as an employee, contractor, advisor, or in any other capacity) to Recess, he shall not access, disclose, or use any Nutrabolt Confidential Information;

3. Remedial Measures: Upon identification by Nutrabolt of additional specific documents or data containing Nutrabolt Confidential Information that Nutrabolt reasonably believes may remain in any Individual Defendant's possession, the Individual Defendants stipulate that they will confer with Nutrabolt in good faith to attempt to develop a protocol for further remediation efforts; and

4. Preservation of Evidence: No provision herein obviates any obligations to preserve evidence, as consistent with the Federal Rules of Civil Procedure and all applicable law.

**IT IS SO ORDERED.**

Signed at Houston, Texas on May 27, 2026.

_____
Keith P. Ellison
United States District Judge